IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BONNIE J. JARVIS,

        Plaintiff,

v.                                   Civil Action No. 1:04-CV-199
                                     (Judge Broadwater)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings

and Defendant's Motion for Summary Judgment and has been referred to the undersigned United

States Magistrate Judge for submission of proposed findings of fact and recommended disposition.

28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Bonnie J. Jarvis ("Plaintiff") filed applications for DIB and SSI on March 11, 2002, alleging

disability beginning March 5, 2002, due to back, neck, and joint pain (R. 50, 72, 105, 256). Both

applications were denied initially and on reconsideration (R. 30, 34, 40). Plaintiff requested a

hearing, which Administrative Law Judge ("ALJ") Karl Alexander held on June 26, 2003 (R. 245).

Plaintiff, who was represented by counsel, testified, as did Eugene Czuczman, Vocational Expert

("VE"). On July 30, 2003, the ALJ issued an unfavorable decision (R. 25). On July 9, 2004, the Appeals Council denied Plaintiff's request for review (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Bonnie J. Jarvis ("Plaintiff") was born on July 19, 1949, and was 54 years old at the time of the ALJ's decision (R. 15). She has an eighth-grade education and past work experience as a companion for an elderly man and as a motel housekeeper (R. 15).

The only issue actually argued in this case concerns Plaintiff's mental impairments, in particular, her I.Q. The undersigned will therefore recite the facts only as they apply to Plaintiff's mental impairments.[1]

---

[1]The undersigned notes that Plaintiff simply lists six other contentions without any argument in support. L.R. Gen P. 83.12(f) provides:

Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (hereinafter "ALJ") consideration of claims or alleging mistaken conclusions of fact or law and contentions or arguments by the Commissioner, supporting the ALJ's conclusions of fact or law **must include a specific reference, by page number, to the portion of the record** which (1) recites the ALJ's consideration or conclusion and (2) which supports the party's claims, contentions or arguments.

(Emphasis in original). Plaintiff clearly has not followed this Local Rule regarding the remaining six contentions. Further, L.R.Civ. P. 7.02 requires all dispositive motions "be accompanied by a supporting memorandum." The undersigned considers the unsupported contentions to be unaccompanied by a supporting memorandum. For example, **Contention V** states that the ALJ committed the following errors:

> **FAILED TO RECOGNIZE AND CONSIDER THE SEVERITY OF THE COMPLAINANT'S COMBINED IMPAIRMENTS, FAILED TO CONSIDER THE EXERTIONAL AND NONEXERTIONAL LIMITATIONS WHEN DECIDING THE ISSUE OF DISABILITY, ERRED IN FINDING PLAINTIFF CAPABLE OF LIGHT WORK, AND RELIED UPON JOBS NAMED BY THE VOCATIONAL EXPERT IN RESPONSE TO A HYPOTHETICAL WHICH DID NOT INCLUDE THE ADDITIONAL EXERTIONAL AND**

The record shows that Plaintiff attended Gilmer County, West Virginia, public schools (R. 114). She entered the first grade in 1956, at age seven. She received all "S's" ("Satisfactory") and "S -minuses" that year. In second grade she received all "S's" except for an "Unsatisfactory" in Arithmetic. In third grade, she received "Unsatisfactories" in Arithmetic and Geography, and an "Unsatisfactory-minus" in Spelling. She was retained and repeated the third grade, obtaining all Satisfactories the second time. In the fourth grade, Plaintiff received B's in Physical Education and Art, C's in Music and Writing, D's in Arithmetic and English, D- in Reading, and F's in Science, Geography, and West Virginia History. In fifth grade, Plaintiff's grades rebounded somewhat, and she received a B in Physical Education, C's in Writing, Spelling, English, and Geography, and D's in Reading, Arithmetic, Science, and U.S. History, with no F's. In the sixth grade, Plaintiff received an A in Physical Education, B in Spelling, C's in Reading, Writing, English, and Social Studies, and D's in Arithmetic, Science, and U.S. History. In seventh grade, Plaintiff received B's in Spelling and Geography, C's in English, Reading, and Physical Education, and D's in Math and Science. Finally, in the eighth grade, Plaintiff received an A in Art, C's in Spelling, Physical Education, and

---

**NONEXERTIONAL LIMITATIONS AS DEMONSTRATED BY THE MOST RELIABLE EVIDENCE OF RECORD, TO SUPPORT HIS FINDING THAT THE PLAINTIFF WAS NOT DISABLED, WHICH ILLEGALLY MINIMIZED THE DEGREE OF THE PLAINTIFF'S IMPAIRMENTS AND NOT IN CONFORMITY WITH THE MEDICAL EVIDENCE. (CHESTER V. MATHEWS, 403 F.SUPP 110 (D. MD. 1975); CORNETT V. CALIFANO, 590 F.2D 92 (4TH CIR. 1978); HICKS V. CALIFANO 600 F.2D 1048 (4TH CIR. 1979); COFFMAN V. BOWEN, 829 F.2D 514 (4TH CIR. 1987); WALKER V. BOWEN, 876 F.2D 1097 (4TH CIR. 1989)).**

No argument follows this conclusory assertion(s). Further, Plaintiff's Conclusion relies almost exclusively on the assertion that she meets or equals Listing 12.05C. The undersigned therefore considers these unsupported arguments waived.

Music, D's in Reading, U.S. History, and West Virginia History, and F's in English, Math and Science. She quit school after the eighth grade.

Under the category "Intelligence Tests" on Plaintiff's school record is an entry dated April 20, 1959, denoted "IT Test," with a score of 70 and no interpretation (R. 113). The only other entry under the heading "Intelligence Tests" is dated April 25, 1960 and refers to "Kuhlman," with a score of 80 and the interpretation "IQ." Neither of these test scores were converted to percentiles.

Plaintiff testified she had had trouble in school because she "couldn't spell right [and] didn't catch up on the reading right" (R. 251). She said she "couldn't understand it that well." She did testify she was able to read and write, could add and subtract "some," could multiply and divide "some," and could read her own mail.

Plaintiff underwent a Psychological Evaluation at the request of her counsel on May 21, 2003 (R. 203). The evaluation was performed by Supervised Psychologist Christy D. Gallaher, M.A., under the supervision of Licensed Psychologist L. Andrew Steward, Ph.D. Plaintiff stated she was applying for disability due to neck, bone, and joint problems and migraine headaches.

Plaintiff told the evaluator she quit school after the eighth grade because she "didn't like it" (R. 204). She reported making "some passing and some not" grades. She stated she was in regular classes, but that there "was no special education then." She was suspended several times for skipping school. She had never seen a therapist or psychiatrist, and was never hospitalized for emotional problems, and never took any psychotropic medications.

Upon Mental Status Examination, Plaintiff received a score the evaluator considered "normal" (R. 205). She was appropriately dressed and groomed, alert, cooperative, friendly, and polite. She maintained eye contact. There was no evidence of confusion or lack of awareness.

Conversation was coherent and speech was spontaneous. She was fully oriented. She could recall one out of three objects after several minutes. Immediate, recent, and remote memory was fair. She could repeat five digits forward and four backward. Attention was fair and concentration was fair. She was able to follow verbal and written commands. Her affect was restricted, her mood was euthymic, and her judgment and insight appeared to be fair.

Plaintiff's scores on the Wechsler Adult Intelligence Scale ("WAIS-III") were 68 Verbal, 73 Performance, and 67 Full Scale (R. 205). The evaluator found the results "likely valid" (R. 208).

Achievement tests indicated Plaintiff scored at the third grade level in Reading and Spelling, and the fifth grade level in Arithmetic (R. 206).

Plaintiff was administered Personality Tests by audio cassette due to her lack of reading skills (R. 207). The self-administered Beck Depression Inventory indicated mild depression. The self-administered Beck Anxiety Inventory indicated moderate anxiety (R. 208).

The evaluator concluded that Plaintiff was functioning in the Mild Mental Retardation range of intelligence. She also found Plaintiff's tests were likely valid and commensurate with her reported education and her intellectual functioning.

The evaluator diagnosed Generalized Anxiety Disorder and Borderline Intellectual Functioning (R. 208).

The evaluator also completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities (R. 210). She found Plaintiff had "Marked" limitations in her ability to relate predictably in social situations in the workplace without exhibiting behavioral extremes; her ability to respond to changes in the work setting or work processes; and her ability to tolerate ordinary work stress (R. 212-213). She would have moderate to slight limitations in all other areas of functioning.

5

The reasons stated for the "marked" limitations were:

> Due to symptoms of anxiety and cognitive ability, Bonnie may have marked/moderate limitations in work-related social functioning . . . .
>
> Due to intellectual functioning and symptoms of anxiety, Bonnie may have marked limitations in adapting to a work setting . . . .
>
> Due to symptoms of anxiety and cognitive ability Bonnie may have marked impairments in her ability to handle work stress.

(R. 211-213). This assessment was signed by both Ms. Gallaher and Dr. Steward (R. 214).

The evaluator also completed a Psychiatric Review Technique ("PRT"), based on Listing 12.06, Anxiety-Related Disorders (R. 215). She found Plaintiff had generalized persistent anxiety accompanied by motor tension, autonomic activity, and apprehensive expectation (R. 220). The evaluator found Plaintiff had marked difficulties in maintaining social functioning; moderate restriction of activities of daily living; moderate difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation, each of extended duration (R. 225). Thus, the evaluator did not find Plaintiff met the "B" criteria of the Listing.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has degenerative arthritis of the hands, cervical spine (mild), and lumbar spine; and borderline intellectual functioning, impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b).

6

4.  These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments. (20 C.F.R. §§ 404.1527 and 416.927).

7.  The claimant has the following residual functional capacity: she is able to perform light work with a sit/stand option; can perform all postural movements occasionally, except she is unable to climb ladders, ropes or scaffolds; is limited in find [sic] manipulation but has no limitation in gross manipulation; should do no overhead lifting or reaching but is able to perform forward reaching; should work in a low stress environment; and is limited to unskilled work involving routine, repetitive instructions and tasks.

8.  The claimant is unable to perform any of her past relevant work. (20 C.F.R. §§ 404.1565 and 416.965).

9.  The claimant is "an individual closely approaching advanced age" (20 C.F.R. §§ 404.1563 and 416.963).

10. The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

11. The claimant has no transferable work skills from any past relevant work. (20 C.F.R. §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of light work. (20 C.F.R. § 416.967).

13. Although the claimant's limitations do not allow her to perform the full range of light work, using Medical Vocational Rule 202.11 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a locker room attendant, photographic machine operator, and photostat operator helper.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 C.F.R. §§ 404.1520(f) and 416.920(f).

(R. 24-25).

## IV. Contentions

Plaintiff contends:

a.      The substantial evidence in the record clearly supports the finding that the plaintiff met the criteria of Listing 12.05C in 2002 when she was last gainfully employed.

Defendant contends:

a.      Plaintiff does not meet the criteria of Listing 12.05, because, as the ALJ found, the evidence does not show deficits in adaptive functioning initially manifested during the developmental period, before age 22, and

b.      The ALJ was not bound to accept the I.Q. scores obtained from Ms. Gallaher's testing in 2003, because those scores could not show Plaintiff's adaptive functioning prior to age 22.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968))*. In reviewing the

8

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Listing 12.05C

Plaintiff argues that the substantial evidence in the record clearly supports the finding that she met the criteria of Listing 12.05C in 2002 when she was last gainfully employed. Defendant contends Plaintiff does not meet the criteria of Listing 12.05, because, as the ALJ found, the evidence does not show deficits in adaptive functioning initially manifested during the developmental period, before age 22.

Listing 12.05C provides:

12.05 *Mental Retardation:* mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., *the evidence demonstrates or supports onset of the impairment before age 22.*
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

(Emphasis added).

Because the ALJ determined that Plaintiff had the severe impairments of degenerative arthritis of the hands, cervical spine (mild), and lumbar spine, it is undisputable that Plaintiff has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." By definition, a "severe" impairment is one that significantly limits the claimant's

9

physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). Further, by finding Plaintiff incapable of performing her past relevant work, the ALJ again also necessarily found she had "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See Branham v. Heckler*, 775 F.2d 1271 at 1273 (4th Cir. 1985) (holding that "the fact that a claimant could not do his past relevant work alone established the other, significant work-related limitation of function required by the regulation.")

Therefore, in order to meet the Listing, Plaintiff need only show she had a valid IQ of 60 through 70, and significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22.

Here, on May 21, 2003, Plaintiff obtained scores on the WAIS-III of 68 Verbal, 73 Performance, and 67 Full Scale (R. 205). The evaluator found the results "likely valid" (R. 208). The ALJ apparently also found these scores valid, because he began his discussion of the issue as follows:

> The claimant's borderline intellectual functioning has been evaluated under Section 12.05 of Appendix 1. The claimant had I.Q. scores of verbal 68, performance 73, and full-scale 67 at the time of the attorney-referred evaluation and she was diagnosed with borderline intellectual functioning.

The ALJ did not find the 2003 test results invalid or even question their validity. The only remaining issue is therefore whether Plaintiff exhibited deficits in adaptive functioning initially manifested before age 22. Plaintiff argues she did, citing her school records showing a score of "70" on an "IT Test," under the heading "Intelligence Tests" in 1959 (R. 113). Plaintiff's school record does also indicate she obtained a score of "80," interpreted as "IQ," on a test identified as "Kuhlman" in 1960 (*Id.*). The ALJ found:

[T]here is no evidence that the I.Q. scores in the 60 through 70 range are indicative of the claimant's general intellectual functioning before age 22. The claimant's school records (Exhibit 10E) show a score of 70 on April 20, 1959, under the category intelligence tests. Although it is not very legible, this appears to be characterized as the claimant's scores on an "IT Test." In any event, the letter after "I" on the report is definitely a capital "T" and not "Q." On the next line in this category is a score of 80 on April 25, 1960. Immediately to the right of this score are the letters "IQ." Given this fact and the relatively standard practice of not giving children I.Q. tests only one year apart the Administrative Law Judge concludes that the score of 80 was on an I.Q. test. Thus, there was not an I.Q. score between 60 and 70 prior to age 22, and the provisions of Section 12.05C are not applicable in the claimant's case. In this regard, the Administrative Law Judge notes that the claimant's grades were not high, but this could well be due, at least in part, to the fact that the claimant quit school in the eighth grade because she "didn't like it" and because she was suspended several times for skipping school (Exhibit 11F).

The undersigned notes there is no requirement in the Regulation that there be an IQ score between 60 and 70 prior to age 22. The Fourth Circuit addressed the issue where a claimant had not had an IQ test prior to age 22, holding:

> The Secretary's regulations expressly define mental retardation as denoting "a lifelong condition." 20 C.F.R. subpart P, Appendix 1 § 12.00(B)(4). *Accord Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir.1983). And we think that there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation. We must and do assume, therefore, that in the absence of any evidence of a change in plaintiff's intellectual functioning from the time of his back injury to the time of his IQ test, that he had the same or approximately the same IQ (63) at the time of his back injury on October 24, 1979 as he did at the time of his 1982 test.

*Branham v. Heckler*, 775 F.2d 1271 (4th Cir. 1985). The undersigned has not, however, located a Fourth Circuit case in which the claimant did have IQ scores prior to age 22, nor has either party cited any cases on point in support of their respective positions.

Significantly, however, the Regulations state:

> The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; *e.g.*, the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of

15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

Pt. 404, Subpart P, App. 1, 12.00 D5c. Here there is no indication of whether either or both of the two school "Intelligence Tests" had a mean of 100 and a standard deviation of 15. Nor is either score converted to a percentile rank. The undersigned therefore does not find the one "IQ" score of "80," on its own, substantial evidence that Plaintiff's IQ was above 70 before age 22. Nor does the undersigned find persuasive the ALJ's conclusion that the "IT Test" on which Plaintiff obtained a score of 70, is *not* an IQ test. It is listed under the heading "Intelligence Tests." The ALJ's additional explanation that it is "a relatively standard practice of not giving children I.Q. tests only one year apart," is without merit. The tests were one year apart almost to the day. Plaintiff was in the third grade both of those years. Even if it were not standard practice to give the same individual child IQ tests one year apart, it is standard practice that each year all students in a given grade take a standardized test. Because Plaintiff was retained in the third grade, it is more than reasonable, in fact likely, that she would have been tested twice. Therefore, the undersigned finds substantial evidence does not support the ALJ's determination that "there was not an I.Q. score between 60 and 70 prior to age 22." [2]

---

[2]The undersigned notes he has himself found in several cases that IQ scores obtained as a child were substantial evidence supporting an ALJ's determination that a claimant did not exhibit the required deficits before age 22. Those cases, however, were factually distinguishable from the case at bar. For example, in one case the earlier IQ scores, all significantly higher than subsequent tests, had been converted to percentiles, as suggested by the Regulation. In another, there were several IQ test results, all of which were again substantially higher than one score obtained after age 22. In addition, one of the earlier scores was from an individual, standardized IQ test given the claimant by a licensed psychologist. *See, e.g., Smith v. Barnhart*, 2:04CV14 (N.D.W.Va. 2005), *Casto v. Barnhart*, 2:01CV38 (N.D.W.Va. 2002).

Further, Plaintiff's grades were not only, as the ALJ noted, "not high," but were actually quite low. She never received higher than a "D" in math and failed a number of subjects. She was retained in the third grade. She finally quit school after the eighth grade, when she was 16 years old.

She had failed English, Math, and Science that year. The ALJ found significant in this regard the fact that Plaintiff stated she quit because she didn't like school, and was suspended several times for skipping school; however, the undersigned believes it at least as likely that the reason Plaintiff did not like school was that she began failing subjects in the second grade. Defendant argues that "Plaintiff did not attend special education classes when she was in school." (Defendant's brief at 7). Plaintiff had explained, however, that "there was no special education then" (R. 204). While the undersigned cannot know definitively that this was the case, he has seen many other cases where it was proven that during the years in question (1956 through 1965) many school systems in West Virginia did not provide special education classes. If the ALJ had reason to disbelieve Plaintiff's explanation, he had only to ask the county board of education if Special Education classes were available at the time.

For all the above reasons, the undersigned cannot find that substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.05C. This is not to say that Plaintiff does meet the Listing. The Fourth Circuit noted in *Branham* that the Commissioner defined mental retardation as "a lifelong condition," and therefore assumed the IQ would remain the same in the absence of any evidence of a change in intellectual functioning. 775 F.2d 1271. The undersigned therefore recommends the Commissioner at least be required to obtain evidence from a mental health expert as to what significance the 1959 and 1960 tests scores have, how reliable they are, what weight they should be accorded and why, and whether Plaintiff's IQ would likely have been

13

approximately the same before age 22 as at the time of her IQ test in 2003. Having found the recent

IQ scores valid, there is no need for current retesting by another psychologist.

On a related issue, Plaintiff argues, "the ALJ's degradation of the evaluator(s) who performed

the only psychological evaluation contained in the record, albeit at the request of counsel, implies

impropriety to all concerned." (Plaintiff's brief at 4.) Plaintiff's counsel referred her for a

psychological evaluation on May 21, 2003, which evaluation was performed by Supervised

Psychologist Christy Gallaher, M.A., under the supervision of Licensed Psychologist L. Andrew

Steward (R. 203). This is, as Plaintiff contends, the only psychological evaluation in the record.

The psychologists conducted a clinical interview, medical record review, mini mental status

examination, IQ testing, Achievement Testing, Personality Testing, and Depression and Anxiety

Inventories. They diagnosed, among others, Generalized Anxiety Disorder and Borderline

Intellectual Functioning (R. 208). The ALJ did find Plaintiff had Borderline Intellectual

Functioning, based on her IQ scores. As regards the Generalized Anxiety Disorder, however, the

ALJ found as follows:

> The Administrative Law Judge further finds that the claimant has failed to establish
> a severe impairment related to her alleged "nerve" problems. The record fails to
> establish a severe impairment related to the generalized anxiety disorder diagnosed
> by the evaluators following the evaluation on May 21, 2003 (Exhibit 11F). Despite
> the claimant's testimony that she has had problems with her "nerves" for years, she
> has never had any mental health treatment or medication and she did not mention
> psychological limitations in any of her disability forms filed with the Social Security
> Administration. This appears to be a case in which the claimant never had any idea
> that she had any mental disorder until her attorney sent her to psychologists, to whom
> the attorney sends subtantial business, for an "evaluation". The Administrative Law
> Judge notes, based on past experience, that the claimant's attorney frequently sends
> her clients to Cardinal Psychological Services and that almost invariably they report
> some sort of mental diagnosis and a marked limitation in at least one area of
> functioning. Given this repeated pattern, the attorney-referred evaluations lose a
> substantial amount of their credibility. The psychological reports and opinions are
> discussed in more detail below, but suffice to say, at this point in the evaluation

14

process the Administrative Law Judge finds no severe impairment related to the diagnosed generalized anxiety disorder. This conclusion is based, inter alia, on credibility issues and the fact that there is no evidence to suggest, and no other reason to believe, that any such impairment, even if it exits, will limit the claimant's functioning for a period of 12 consecutive months. This is particularly true where the claimant has never had a mental diagnosis or treatment.

(R. 16). Later in his Decision, the ALJ made the following finding regarding the examining

psychologists' report:

The Administrative Law Judge notes that consistent with the vague nature of the report on the evaluation, the evaluators gave tentative opinions on the claimant's ability to function in the areas rated in the assessment form. They opined that due to her impairments and symptoms the claimant "may" have the degree of limitation assessed. The Administrative Law Judge views this process as a somewhat deplorable example of a psychological evaluator trying to find something to say that will satisfy the expectations of the referring attorney. These evaluators have little credibility with the Administrative Law Judge. Their opinions are entitled to no particular significance and the Administrative Law Judge accords them none.

(R. 21). Plaintiff's complaint is well-taken, but do the ALJ's unfortunate remarks merit reversal?

The undersigned could find no Fourth Circuit decision directly on point, but both the Ninth Circuit

and Eleventh Circuit have ruled on the issue. In *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996), a

remarkably similar case, the claimant's attorney had sent her to a psychiatrist for evaluation. The

psychiatrist found the claimant suffered from major depression, and reported she had a "marked"

limitation on her ability to perform in a work setting. *Id.* at 1399. By contrast, a consulting

psychologist retained by the Commissioner diagnosed a mild adjustment disorder with anxious

mood, and found the claimant's ability to perform work-related activities was "quite good and

relatively normal." *Id.* Likewise, a medical doctor who examined the claimant at the request of her

attorney found the claimant totally disabled from any employment, while a consultative medical

doctor hired by the Commissioner found she could perform sedentary work.

In *Miles*, the ALJ rejected the evaluations of the doctors to whom claimant was referred by

her attorney, and credited those of the doctors hired by the Commissioner. The District Court noted

that the ALJ "provided several reasons for this credibility determination, which included an observation that 'Dr. McLain's examinations for Mr. McCluskey [claimant's attorney] almost invariably conclude that the person being examined is totally disabled.'" *Id.* The Court noted the ALJ also stated: "McLain 'concluded (as he usually does) that she was totally disabled.'" *Id.* at fn. 4. The ALJ's comments regarding the attorney-referred psychologist included:

> Although the assessment by Dr. L. Edward Shehi, Jr., who examined the claimant at the request of Mr. McCluskey, not unexpectedly found marked impairments in all categories due to major depression, the assessment from the treating physicians and the [Commissioner's] consulting psychologist indicated a much less severe impairment.

*Id.* at 1401.

> The District Court in *Miles* had asked:

> What is the source and substantiation of these statements? It is certainly not in this record. Is the ALJ reflecting on his own past experience or merely restating gossip within the Social Security family? In point of fact, no matter what the provenance of these statements is, they cannot appear *sua sponte* (if at all) in the final opinion. Their inclusion is both unfair to Miles, who has had no opportunity to rebut them, and gratuitous insults to Dr. Miles [Sic] and Murray P. McCluskey, deserved or not. Whether these comments were based in personal experience or personal animosity, they have no place in the disability evaluation process.

*Id.* The District Court concluded, however, that the comments did not require reversal, especially because the ALJ had provided other reasons for rejecting the opinions.

The Eleventh Circuit reversed, first stating that the Social Security Act "contemplated that disability hearings will be individualized determinations based on evidence adduced at a hearing," *citing Heckler v. Campbell*, 461 U.S. 458, 467, 103 S. Ct. 1952, 1957, 76 L.Ed.2d 66, 74 (1983). The Court did not reach the issue of whether substantial evidence supported the ALJ's decision, but instead concluded the claimant was "entitled to an unbiased evaluation of her claim before another ALJ." *Id.* at 1400.

The Ninth Circuit held similarly in *Reed v. Massanari*, 270 F.3d 838 (9th Cir. 2001). In that case, the claimant had requested a rheumatologist examination during the administrative hearing. The ALJ refused, stating:

> You know the problem with that is that we only have two [available for consultative examinations]. Both of which are totally unreliable. Because they treat all the cases here and everybody is disabled. Every report I've ever seen from them, so I don't trust anything they send me. So, . . . that's the problem. Because I considered, frankly, sending this out to a rheumatologist, and I can't get anybody that I trust to tell me . . . I don't want to shortchange you . . . but I don't trust any of those two doctors, I just don't.

*Id.* at 840. The Ninth Circuit found:

> It appears . . . that the sole basis for the ALJ's refusal to order a consultative examination was his perception that both available examiners with the appropriate specialization conclude that "everybody" is disabled. The implication, of course, is that at least some of these conclusions inaccurately reflect the claimants' true medical status. Thus, the ALJ rested his decision on the premise that both rheumatologists recruited by the State agency are unable or unwilling to provide reliable opinions on matters of rheumatology. This premise amounts to an unfavorable review of the competence of the medical professionals recruited by the State agency to perform consultative examinations.

The Ninth Circuit then concluded:

> [T]he decision at issue here turned on an assessment of the quality of previously rendered medical opinions. That is an issue open to contest, and one that cannot be resolved by an ALJ without analysis from other medical professionals, of which this record is barren.

*Id.* at 844. While finding that the ALJ was not biased against the claimant, the Ninth Circuit remanded the matter with instructions that it be assigned to a different ALJ "who can fairly consider the opinions of the two available rheumatologists." *Id* at 845.

Defendant might argue that because the ALJ in this case also stated permissible reasons for rejecting the psychologists' opinion, the impermissible reasons result in no more than harmless error. It is true the ALJ also found the evidence did not support the psychologists' opinion. However, in

*Miles*, the ALJ had also stated unobjectionable reasons for his rejection of the evidence. *See* 84 F.3d at fn. 7. In addition, the Ninth Circuit, in an unpublished opinion, also found reversible error even where the ALJ had valid reasons for rejecting the evidence. In *Wentworth v. Barnhart*, 71 Fed. Appx. 727 (9th Cir. 2003),[3] the ALJ accorded no weight to the opinion of Dr. Brown, the claimant's treating physician. The ALJ gave three reasons for rejecting the opinion. First, he found that there was no evidence of some of the impairments found by Dr. Brown elsewhere in the record. Second, he stated that "[a]s usual," Dr. Brown cited certain studies, and left out others the ALJ deemed important. Third, the ALJ stated that: "Brown, in short is, a plaintiff's doctor who reports what he is paid to say, *i.e.*, disability." *Id.* at 728.

The Ninth Circuit held that the first reason given by the ALJ was legitimate. The other two, however, "are illegitimate and indicate a bias against Dr. Brown that casts serious doubt on the ALJ's ability to view Dr. Brown's opinion objectively." *Id.* The Court found that both these illegitimate reasons were "unsupported by the record and indicative of a bias against Dr. Brown, presumably based on past experience with the doctor. The ALJ should not have based his opinion on past activity by Dr. Brown that was not in the record." The Court also found that the reliance on the "illegitimate factors" was not rendered harmless by the one legitimate reason for rejecting Dr. Brown's opinion.

There are two additional reasons for rejecting the ALJ's decision regarding Plaintiff's alleged mental impairments in this matter. First, if the ALJ found the attorney-retained psychologists' opinion so untrustworthy, he could have sent Plaintiff to an examiner of his choice. Here, he did not even send the record to a State agency-hired, non-examining reviewing psychologist. Second, if the

---

[3]The undersigned has attached a copy of *Wentworth* to this Opinion.

undersigned were to consider the ALJ's unsupported opinion regarding the attorney-hired psychologists' bias toward claimants, would he not also have to do the same in his consideration of the opinions of the State-agency-paid examiners, experts, and, especially non-examining reviewing physicians and psychologists? In fact, several different Plaintiffs' counsel have asked the undersigned to do just that in a number of cases. The undersigned has rejected other claimants' arguments that the State agency medical and psychological experts were biased against them, instead choosing to base his decisions on whether the opinions were supported by the evidence of record and whether they were inconsistent with other persuasive evidence in the record. The undersigned cannot, in all fairness, do less when it comes to a Plaintiff's medical experts.

For all the above reasons, the undersigned cannot find that substantial evidence supports the ALJ's conclusion regarding Plaintiff's alleged mental impairments. I therefore recommend this matter be reversed and remanded to the Commissioner for further proceedings consistent with this Report and Recommendation. The undersigned also strongly recommends the issue of Plaintiff's alleged mental impairments be heard by a different ALJ.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB, and I accordingly recommend that Defendant's Motion for Summary Judgment be **DENIED**, and that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED in part** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *17* day of June, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

71 Fed.Appx. 727, 2003 WL 21782673 (9th Cir.(Wash.))

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.
Ginger WENTWORTH, Plaintiff--Appellant,
v.
Jo Anne B. BARNHART, Commissioner, Commissioner of Social Security, Defendant--
Appellee.
No. 02-35418.
D.C. No. CV-00-5560-FDB.
Argued and Submitted July 11, 2003.
Decided Aug. 1, 2003.

Claimant brought action for review of decision of the Commissioner of Social Security (SSA) which denied her application for disability benefits. The United States District Court for the Western District of Washington, Franklin D. Burgess, J., affirmed, and claimant appealed. The Court of Appeals held that two of **ALJ's** reasons for discounting treating **physician's** opinion were illegitimate and indicated a **bias against physician**.
Reversed and remanded with directions.

West Headnotes


KeyCite Notes

⊙ 356A Social Security and Public Welfare
  ⊙ 356AII Federal Insurance Benefits in General
    ⊙ 356AII(C) Procedure
      ⊙ 356AII(C)1 Proceedings in General
        ⊙ 356Ak142.10 k. Findings and Conclusions. Most Cited Cases


⊙ 356A Social Security and Public Welfare KeyCite Notes
  ⊙ 356AII Federal Insurance Benefits in General
    ⊙ 356AII(C) Procedure
      ⊙ 356AII(C)3 Judicial Review
        ⊙ 356Ak149 k. Determination, Findings, and Judgment. Most Cited Cases

In social security disability benefits case, two of **ALJ's** reasons for discounting treating **physician's** opinion were illegitimate and indicated a **bias against physician**, requiring remand for a new hearing before a new **ALJ,** even though there was also a legitimate reason for rejecting **physician's** opinion; **ALJ's** statements that treating **physician**, "as usual," neglected to cite two particular studies, and that he was "a plaintiff's doctor who reports what he is paid to say, i.e., disability," were unsupported by the record.
***728** Appeal from the United States District Court for the Western District of Washington, Franklin D. Burgess, District Judge, Presiding.

Before REAVLEY, [FN*] TASHIMA, and PAEZ, Circuit Judges.

FN* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.


MEMORANDUM [FN**]

FN** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.


**1 Ginger Wentworth appeals the district court's order affirming the Commissioner of Social Security's decision to deny her disability benefits. [FN1] We reverse and remand for a hearing before a new Administrative Law Judge ("ALJ").

FN1. Because the parties are familiar with the factual and procedural history of this case, we will not recount it here.


The ALJ did not "accord any weight to Dr. Brown's opinion" that Wentworth was severely disabled. Wentworth argues that the ALJ failed to give proper weight to the determination of Dr. Brown, a treating physician.

The ALJ gave three reasons for discounting Dr. Brown's opinion. First, he noted that Dr. Brown found that Wentworth suffered from cold weather intolerance, restless leg, cognitive disorder and fevers and held that there was no evidence of these problems elsewhere in the record. Second, he stated that "[a]s usual," Dr. Brown cited only a few medical studies while leaving out other studies that the ALJ deemed important. Finally, the ALJ stated that "Brown, in short is, a plaintiff's doctor who reports what he is paid to say, i.e., disability."

Because Dr. Brown's opinion conflicts with the opinions of both Dr. Anderson and Dr. Jump, the ALJ could reject his opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir.1995).

Although the ALJ's first reason for discounting Dr. Brown's testimony may be viewed, on its own, as "specific and legitimate," we hold that the other two reasons given by the ALJ are illegitimate and indicate a bias against Dr. Brown that casts serious doubt on the ALJ's ability to view Dr. Brown's opinion objectively. The ALJ's conclusions that Dr. Brown, "[a]s usual," neglected to cite two particular studies and that he is "a plaintiff's doctor who reports what he is paid to say, i.e., disability," are both unsupported by the *729 record and indicative of a bias against Dr. Brown, presumably based on past experience with the doctor. The ALJ should not have based his opinion on past activity by Dr. Brown that was not in the record. *See Reed v. Massanari,* 270 F.3d 838, 843-44 (9th Cir.2001) (holding that it was improper for the ALJ to reject opinions of doctors based on past decision that were not examined on the record); *see also Lester,* 81 F.3d at 832 (holding that an ALJ "may not assume that doctors routinely lie in order to help patients collect disability benefits" (quoting *Ratto v. Secretary,* 839 F.Supp. 1415, 1426 (D.Or.1993))).

This reliance on illegitimate factors is not rendered harmless by the fact that the ALJ may have provided a "specific and legitimate" reason for rejecting Dr. Brown's opinion. The nature of the improper factors relied upon by the ALJ indicates that he was prejudiced against Dr. Brown and may not have given Dr. Brown's opinion the weight it was due. "Because the ALJ mistrusts, based on prior experience, the evaluations of [Dr. Brown], he [may] not be able to assess fairly [his opinion]." *Reed,* 270 F.3d at 845. Although the ALJ's first reason for discounting Brown's opinion, when viewed in isolation, could have been sufficient to support the decision, it did not mandate it in light of the ALJ's bias. Had the ALJ not been biased against Dr. Brown, he might have decided to credit Brown's opinion and the results of the hearing would have been different.

**2 "In order for [Wentworth] to get a fair hearing, the case must be heard by an ALJ who can fairly consider the opinion[ ] of [Dr. Brown]." *Id.* We therefore reverse and remand to the district court with directions to remand to the Social Security Administration with instructions that the matter be

assigned to a different ALJ for a new determination of Wentworth's disability status. [FN2]

> FN2. Because we conclude that the ALJ's improper treatment of Dr. Brown's opinion requires a new hearing, we do not reach Wentworth's other challenges to the ALJ's decision.

The judgment of the district court affirming the Commissioner's decision is **REVERSED** and **REMANDED.**
C.A.9 (Wash.),2003.
Wentworth v. Barnhart
71 Fed.Appx. 727, 2003 WL 21782673 (9th Cir.(Wash.))

## Briefs and Other Related Documents (Back to top)

- 2002 WL 32155641 (Appellate Brief) Plaintiff-Appellant's Reply Brief (Aug. 13, 2002)Original Image of this Document (PDF)
- 2002 WL 32155642 (Appellate Brief) Defendant-Appellee's Brief (Jul. 22, 2002)Original Image of this Document (PDF)
- 2002 WL 32155643 (Appellate Brief) Plaintiff-Appellant's Brief (Jul. 08, 2002)Original Image of this Document (PDF)
- 02-35418 (Docket) (Apr. 29, 2002)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.